**IN THE UNITED STATES DISTRICT COURT**
.EASTERN DISTRICT OF ARKANSAS
WESTERN   DIVISION

| | | |
|---|---|---|
| STUART R. DAY, ET AL. | * | |
| | * | |
| Plaintiffs | * | |
| | * | |
| VS. | * | |
| | * | NO: 4:09CV00031   SWW |
| CELADON TRUCKING SERVICES, | * | |
| INC. | * | |
| | * | |
| Defendant | | |

**ORDER**

Former employees of nonparty Continental Express, Inc. ("Continental") bring this class action against Celadon Trucking Services, Inc. ("Celadon") pursuant to the Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. §§ 2101-2109.  Plaintiffs claim that Celadon purchased Continental and terminated their employment without providing sixty days' advance notice as required under the WARN Act.  Before the Court is Plaintiffs' motion for summary judgment on the issue of liability (docket entries #55, #56, #57), Celadon's response in opposition and cross-motion for summary judgment (docket entries #62, #63, #63),  Plaintiffs' reply in support of their motion for summary judgment (docket entry #67), Plaintiffs' response in opposition to Celadon's cross-motion for summary judgement (docket entries #70, #71), and Celadon's reply (docket entry #74).  After careful consideration, and for reasons that follow, the Court finds that Plaintiffs are entitled to partial summary judgment on the issue of liability.

**I.**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

The non-moving party may not rest on mere allegations or denials of his pleading but must "come forward with 'specific facts showing a genuine issue for trial.'" *Id*. at 587 (quoting Fed. R. Civ. P. 56(e)). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 401 (8th Cir. 1995).

## II.

The purpose of the WARN Act is to provide "workers and their families some transition time to adjust to the prospective loss of employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market." 20 C.F.R. § 639.1(a). The WARN Act prohibits employers from ordering "a plant closing or mass layoff until the end of a sixty-day period after the employer serves written notice of such an order." 29 U.S.C. § 2102(a). "Any employer who orders a plant closing or mass layoff [without providing the required notice] shall be liable to each

aggrieved employee who suffers an employment loss as a result of such a closing or layoff[1] for

back pay for each day of the violation . . . . " 29 U.S.C. § 2104(a)(1).  The Act defines

"employment loss" as (1) an employment termination, other than a discharge for cause,

voluntary departure, or retirement; (2) a layoff exceeding 6 months; or (3) a reduction in hours of

work of more than 50 percent during each month of any 6-month period.  *See* 29 U.S.C. § 2104.

 

     Important to this case, the WARN Act includes an exception to the Act's definition of

"employment loss" as follows:

> In the case of a sale of part or all of an employer's business, the seller shall be
> responsible for providing notice for any plant closing or mass layoff . . . up to and
> including the effective date of the sale.  After the effective date of the sale of part or
> all of an employer's business, the purchaser shall be responsible for providing notice
> for any plant closing or mass layoff . . . . *Notwithstanding any other provision of this*
> *chapter, any person who is an employee of the seller (other than a part-time*
> *employee) as of the effective date of the sale shall be considered an employee of the*
> *purchaser immediately after the effective date of the sale*.

29 U.S.C. § 2101(b)(1)(emphasis added).  Pursuant to the sale-of-business exception, the mere

sale of part or all of a  business does not trigger the notice requirement, and workers who shift

from one employer to another as the result of a sale do not thereby suffer an employment loss.

"Instead, the WARN Act creates a system that allocates notice responsibility between the seller

---

[1] Whether an "employment loss" comes as a result of "plant closing" or "mass layoff"
depends on the number of employees affected.  A "plant closing" occurs with "the permanent or
temporary shutdown of a single site of employment, or one or more facilities or operating units
within a single site of employment, if the shutdown results in an employment loss at the single
site of employment during any 30-day period for 50 or more employees excluding any part-time
employees." 29 U.S.C. § 2101(a)(2).  A "mass layoff" occurs when there is a reduction in force
that is not the result of a plant closing that results in an "employment loss" (1) at a single site, for
at least 33 percent of the employees (excluding any part-time employees) and at least 50
employees (excluding any part-time employees) or (2) at least 500 employees (excluding any
part-time employees).  *See* 29 U.S.C. § 2101(a)(3).

of the business and the buyer of the business, and only the party actually causing an employment loss due to plant closing [or mass layoff] is required to provide WARN Act notice." *Wilson v. Airtherm Products, Inc.*, 436 F.3d 906, 901 (8th Cir. 2006).  "As long as the seller's employees are employed by the seller on the effective date of the sale, those employees are considered to be employees for the buyer 'immediately after the effective date of the sale.'"  *Id.*(citing 29 U.S.C. § 2101(b)(1)).

## III.

In this case, Continental operated a trucking business headquartered in Little Rock Arkansas.  On December 4, 2008, Continental and Celadon entered an asset purchase agreement, whereby Celadon purchased substantially all of Continental's assets.  Plaintiffs worked full time for Continental, and they allege that on December 4, 2008, "they were told, for the first time, that Continental had been sold to Celadon, and . . . their employment would end on or about December 17, 2008."  Amend. Compl., ¶ 6.

On the date of the sale, Continental had 658 employees, and after the sale, Celadon offered employment to 201 of those 658 employees.  *Compare* Plfs.' St. Mat. Facts (docket entry #57) ¶¶ 14-15, *with* Def.'s St. Mat. Facts (docket entry #64) ¶ 6.  Plaintiffs did not receive an offer of employment from Celadon, and their employment was terminated during the period from December 5 through December 17, 2008.[2]  No plaintiff received written notice regarding the

_____

[2]Plaintiffs' statement of material facts not in dispute provides that Plaintiffs continued to be employed after the December 4, 2008 sale date and that most of them continued to be employed through December 17, 2008.  *See* Plfs.' St. Mat. Facts (docket entry #57), ¶ 6.  In its responsive statement, Celadon does not controvert the foregoing statement, but it states that plaintiffs continued to be employed as employees of Continental, not Celadon.  *See* Def.'s St. Mat. Facts (docket entry #3).

termination of his or her employment.

Plaintiffs maintain that Celadon's purchase of Continental's assets qualifies as the "sale of part or all" of Continental's business and that they became Celadon employees immediately after the date of the sale, December 4, 2008, by operation of § 2101(b)(1).  Plaintiffs further assert that they suffered an employment loss as a result of a mass layoff that occurred after the sale and that Celadon failed to provide them notice as required under the WARN Act.

Celadon does not dispute that plaintiffs suffered an "employment loss" as a result of a "mass layoff," nor does Celadon dispute that Plaintiffs were terminated without receiving sixty days' advance written notice.   However, Celadon maintains that no genuine issues exist for trial because Plaintiffs remained Continental employees after the sale, and § 2101(b)(1) does not apply to its purchase of Continental's assets.

The Eighth Circuit has "recognized that when a case involves simply a sale of assets as opposed to the sale of a business as a going concern, the seller retains the WARN Act notice requirement because the seller is the party actually closing the plant that results in employment losses  . . . . " *Wilson v. Airtherm Products, Inc*., 436 F.3d 906, 910 (8th Cir. 2006)(citing *Smullin v. Mity Enterprises, Inc*. 420 F.3d 836, 839-40 (8th Cir. 2005).  However, when a business is sold as a going concern, any potential notice requirement falls on the buyer's shoulders.  *Id*.

According to Celadon, its purchase of Continental's assets did not amount to the "sale of

---

Local Rule 56.1 provides that a party moving for summary judgment must submit a statement of the material facts as to which it contends there is no genuine issue to be tried, and the non-moving party must file a responsive statement of the material facts as to which it contends a genuine issue exists to be tried.  "All material facts set forth in the statement filed by the moving party . . . shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . . " Local Rule 56.1(c).

all or part of a business" under § 2101(b)(1) because it merely "incorporated the purchased assets from [Continental] into its own business."  Docket entry #63, at 9.   Continental's description of the transaction is not determinative.  The Eighth Circuit has explained that "the universe of transactions for which the WARN Act deems the seller's employees to be employees of the buyer immediately after the sale" includes "*any* transaction that transfers all or part of the employer's overall operations as a *going concern*."  *Smullin v. Mity Enterprises, Inc*., 420 F.3d 836, 839 (8th Cir. 2005).

In an effort to show that Celadon's purchase constituted the sale of Continental's business as a going concern, Plaintiffs present the following undisputed evidence:

- On December 4, 2008, Celadon purchased substantially all of Continental's assets, including all "Agreements, contracts, commitments, leases, plans, bids, quotations, proposals, instruments, computer programs and software, data bases . . . related objects and source codes, manuals and guidebooks, price books and price lists, customer and subscriber lists, supplier lists, sales records, files, correspondences, legal opinions, rulings issued by governmental entities, and other documents, books, records, papers, files, office supplies, furniture and fixtures, company vehicles, yellow iron equipment, equipments . . . and data . . . . " Docket entry #55, Ex. #3 (Asset Purchase Agreement, § 7.1.i).

- The Continental/Celadon asset purchase agreement provides that Celadon will offer employment to some of Continental's "driver and non-driver" employees.  *See id*. (Asset Purchase Agreement, § 5.2).  The agreement states that simultaneous with the execution of the purchase agreement on December 4, 2008, Celadon will provide Continental three lists–one naming Continental drivers that Celadon intends to hire, one naming Continental drivers that Celadon will not hire, and one naming Continental non-drivers that Celadon intends to hire.  *See id*. (Asset Purchase Agreement, § 5.2).  The agreement states: "Seller shall sent the notices required by the [WARN] Act and be responsible for any costs and expenses connected therewith."[3]  *Id*. (Asset Purchase Agreement, § 5.2(e)).

- The purchase agreement provides that on the closing date "Seller and/or Purchaser" shall

_____

[3]The purchaser of a going concern cannot, by contract, transfer its WARN Act duties to the seller.  *See Wilson v. Airtherm Products, Inc*., 436 F.3d 906, 912 & n.4 (8th Cir. 2006)(attempts to structure a sale in such a way to avoid purchaser liability has no effect).

contact individuals on the "Non-hired Driver List" and instruct them to "deliver to the nearest Purchaser turn-in location any rolling stock and/or other assets included in the Purchased Assets." *Id.* (Asset Purchase Agreement § 5.2(b)).

• By affidavit, Plaintiff Karl Hill testifies that he worked for Continental as a truck driver prior to December 4, 2008. Docket entry #55, Ex. #8. Hill testifies that on December 5, 2008, he was driving a truck in Illinois and received notice that Continental had been sold to Celadon. *Id.*, ¶ 4. Hill reports that he was instructed to drive his truck to Celadon's terminal in Indianapolis, and when he arrived at the terminal, he and other drivers were informed that they were being terminated. *Id.*, ¶ 5. Hill testifies that he waited in a breakroom for eight hours and eventually received a bus ticket home. *Id.*, ¶ 6. According to Hill, he was never paid for the work he performed on December 5, 2008 or for the eight hours he spent waiting for a way home. *Id.*, ¶ 8.

• Continental and Celadon entered a one-year lease agreement dated December 4, 2008, whereby Celadon leased Continental property located in Little Rock for the stated purpose of "conducting its business of transporting property by motor carrier . . . ." Docket entry #67, Ex. #2.

• Timothy Hodnett served as Continental's vice president of human resources. According to Hodnett's affidavit testimony, he participated in "transition activities" after December 4, 2008. Docket entry #55, Ex. #5, ¶ 2. Hodnett testifies that individuals who worked for Continental before December 4, 2008 and were not offered permanent employment with Celadon remained employed after the sale to "either perform their regular job duties or assist Celadon in the sales transition." *Id.*, ¶ 5. Hodnett further testifies that after the sale, Celadon continued to operate trucks out of the Little Rock terminal, and Celadon officers directed the aforementioned employees to perform tasks such as recruitment and dispatch operations from the Little Rock worksite. Docket entry #67, Ex. #1, ¶ 5.

• By affidavit, Plaintiff Stuart R. Day testifies that he served as Continental's vice president of operations and participated in "transition activities" after December 4, 2008. *See* docket entry #55, Ex. #6, ¶ 2. According to Day, individuals who worked for Continental before December 4, 2008 and were not offered permanent employment by Celadon remained employed after the sale to assist Celadon. Day states that some employees changed signage on trucks and replaced Continental decals with Celadon's, and other employees contacted Continental's former customers to notify them of Celadon's purchase. *Id.*, ¶ 5.

• In a press release dated December 4, 2008, Celadon announced that it purchased the "truckload, intermodal and brokerage business, as well as approximately 400 tractors and 1,000 trailers of Continental . . . . " Docket entry #55, Ex. #1. The press release quotes Celadon's CEO, who states: "Based on our evaluation of the business, we believe Continental has quality customers and drivers, but suffered from a cost structure that plagues may mid-sized carriers. We expect to integrate the acquired operations promptly." *Id.*

The Court finds that the foregoing evidence demonstrates that Celadon purchased Continental's assets with the intent to run the business as a going concern and that Celadon carried out that plan.  The fact that Celadon integrated Continental's business into its own does nothing to negate the fact that Celadon purchased Continental's business as a going concern.

Celadon asserts that after December 4, 2010, Plaintiffs were retained as employees for Continental for the purpose of assisting the company in winding up its own affairs.  *See* docket entry #63, at 2.  Celadon presents a copy of a document titled "Consent to Action by the Board of Directors and Shareholders of Continental Express, Inc." (docket entry #62, Ex. B), which acknowledges the sale of Continental's revenue equipment and operating assets to Celadon on December 4, 2008 and states that "following the closing, the Company [Continental] is authorized and directed to take such actions that may be necessary to wind down its business affairs . . . . "  *Id*.  The fact that Continental began  "winding up its own affairs" *after* the sale to Celadon lends no support to Celadon's position that it did not purchase Continental's business as a going concern.  Furthermore, Celadon presents no evidence to contradict the testimony of former Continental employees, who testify that they remained employed for a short period after Celadon's purchase and assisted Celadon with transition activities.

Despite undisputed evidence demonstrating that Celadon purchased Continental as a going concern and that Plaintiffs became Celadon employees after the sale by operation of § 2101(b)(1), Celadon contends that Plaintiffs should be judicially estopped from proceeding with their WARN Act claims.   Celadon reports that some of the plaintiffs in this case filed a breach of contract action against Continental in state court, seeking payment for unused vacation time.  Celadon notes that in the state court proceeding, the plaintiffs alleged that Continental

served as their employer and terminated their employment; but in this case, Plaintiffs take the position that Celadon, as Plaintiffs' employer under § 2101(b)(1), breached its duty to provide WARN Act notice.

Judicial estoppel is an equitable doctrine intended to prevent the improper use of judicial machinery, and it should be applied when a party's later position is "clearly inconsistent" with its earlier position.  *See New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 1815 (2001)(citations omitted).   "A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court."  *Stallings v. Hussmann Corp.* 447 F.3d 1041, 1047 (8th Cir. 2006).   "[A] party that takes a certain position in a legal proceeding, 'and succeeds in maintaining that position,' is prohibited from thereafter assuming a contrary position 'simply because his interests have changed,' especially if doing so prejudices the party 'who acquiesced in the position formerly taken by him.'"  *Id*. (quoting *New Hampshire v. Maine*, 532 U.S.742, 748, 121 S.Ct. 1808 (2001)).

The substantive basis for Plaintiffs' WARN Act claim, that Celadon is *deemed* Plaintiffs' employer under § 2101(b)(1) for purposes of the WARN Act notice requirement, is not inconsistent with a claim that Plaintiffs and Continental shared an employment relationship and that Continental breached a contractual duty to pay Plaintiffs for unused vacation time.  The WARN Act provides: "The rights and remedies provided to employees by this chapter are in addition to, and not in lieu of, any other contractual or statutory rights and remedies of the employees, and are not intended to alter or affect such rights and remedies . . . ." 29 U.S.C. § 2105.   The Court disagrees that judicial estoppel bars Plaintiffs from asserting a claim under the

9

WARN Act.

## IV.

For the reasons stated,   the Court finds that Plaintiffs' motion for partial summary judgment on the issue of liability (docket entry #55) should be and it is hereby GRANTED. Defendant's cross motion for summary judgment (docket entry #62) is DENIED.

IT IS SO ORDERED THIS 13TH DAY OF OCTOBER, 2011.

/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE