**IN THE UNITED STATES DISTRICT COURT**
EASTERN DISTRICT OF ARKANSAS
WESTERN   DIVISION

STUART R. DAY, ET AL.                *
                                    *
        Plaintiffs            *
                                    *
VS.                                 *
                                    *          NO: 4:09CV00031   SWW
CELADON TRUCKING SERVICES,          *
INC.                                *
                                    *
        Defendant

**<u>ORDER</u>**

    This is a class action against Celadon Trucking Services, Inc. ("Celadon") pursuant to the

Worker Adjustment and Retraining Notification Act ("WARN Act" or "Act"), 29 U.S.C.

§§ 2101-2109.   Before the Court are (1) findings and recommendations regarding class

membership issued by United States Magistrate Judge H. David Young (ECF No. 157),

Plaintiffs' objections (ECF No. 159), Celadon's objections (ECF No. 160), and Celadon's

response to Plaintiffs' objections (ECF No. 162); (2) Celadon's motion for discovery (ECF No.

161); (3) Celadon's renewed motion to decertify the class (ECF No. 163), Plaintiffs' motion to

dismiss Celadon's motion to decertify (ECF No. 167), and Celadon's reply (ECF No. 169); and

(4) Plaintiffs' motion for sanctions (ECF No. 165), Celadon's response in opposition (ECF No.

169), and Plaintiffs' reply (ECF No. 170).   After careful consideration, and for reasons that

follow, the findings and recommendations issued by Judge Young are adopted to the extent that

the Court finds that Angela Berry, Duarl Richardson and Randy Anthony do not meet the class

definition and thus are not members of the plaintiff class.   Celadon's motions for discovery and

decertification and Plaintiffs' motion for sanctions are denied.   The case will proceed on the

issue of damages.

## I.  The WARN Act

The WARN Act prohibits employers from ordering "a plant closing or mass layoff until the end of a sixty-day period after the employer serves written notice of such an order . . . to each . . . affected employee . . . ." 29 U.S.C. § 2102(a).  An "affected employee" under the Act is an employee who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff.  *See* 29 U.S.C. § 2101.  An "affected employee" is not a self-employed individual or a consultant or contract employee, who has an employment relationship with and is paid by another employer.  *See* 20 C.F.R. § 639.3(e).

A "mass layoff" occurs when there is a reduction in force that is not the result of a plant closing[1] that results in an employment loss (1) at a single site, for at least 33 percent of the employees (excluding any part-time employees) and at least 50 employees (excluding any part-time employees) or (2) at least 500 employees (excluding any part-time employees).  *See* 29 U.S.C. § 2101(a)(3).

The WARN Act provides that any employer who violates the notice provision shall be liable to each aggrieved employee who suffers an employment loss for back pay and benefits for each day of the violation.[2]  An "aggrieved employee" under the Act is "an employee who has

---

[1]A "plant closing" occurs with "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2).

[2]The applicable provision of the WARN Act provides:

(1) Any employer who orders a plant closing or mass layoff in violation of section 3 of this Act [29 U.S.C. § 2102] shall be liable to each aggrieved employee who

worked for the employer ordering the . . . mass layoff and who, as a result of the failure by the employer to comply with section 2102 . . . , did not receive timely notice . . . as required by section 2102." 29 U.S.C. § 2104(7).

In the case of the sale of all or part of a business, the WARN Act's sale-of-business provision allocates the duty to provide notice of a plant closing or mass layoff as follows: The seller is responsible for providing notice for any plant closing or mass layoff that occurs up to and including the effective date of the sale, and the purchaser is responsible for providing notice of any plant closing or mass layoff that occurs after the effective date of the sale. *See* 29 U.S.C. § 2101(b)(1). The WARN Act provides that "any person who is an employee of the seller (other than a part-time employee) as of the effective date of the sale shall be considered an employee of

_____

suffers an employment loss as a result of such closing or layoff for—

(A) back pay for each day of violation at a rate of compensation not less than the higher of—

(I) the average regular rate received by such employee during the last 3 years of the employee's employment; or

(ii) the final regular rate received by such employee; and

(B) benefits under an employee benefit plan described in section 3(3) of the Employee Retirement Income Security Act of 1974 (29 U.S.C. 1002(3)), including the cost of medical expenses incurred during the employment loss which would have been covered under an employee benefit plan if the employment loss had not occurred.

Such liability shall be calculated for the period of the violation, up to a maximum of 60 days, but in no event for more than one-half the number of days the employee was employed by the employer.

29 U.S.C. § 2104(a)(1).

the purchaser immediately after the effective date of the sale."  29 U.S.C. § 2101(b)(1).

## II.  Case Background

Plaintiffs worked for non-party Continental Express, Inc. ("Continental"), a company that operated a trucking business that was purchased by Celadon on December 4, 2008.  Plaintiffs filed this class action on January 1, 2009, claiming that after Celadon purchased Continental's business, it terminated their employment as part of a mass layoff, without providing sixty days' advance notice as required under the WARN Act.

On August 16, 2010, the Court granted Plaintiffs' renewed motion for class certification, and certified a class defined as "all persons who were employees of the former Continental operation in Little Rock and were terminated following the sale to [Celadon] in December of 2008, and who did not receive [sixty days'] notice that a plant closing and/or mass layoff was going to take place at that time." ECF No. 44, at 2.

### Summary Judgment Proceedings on Liability

On April 6, 2011, Plaintiffs sought summary judgment on the issue of liability and presented the following evidence:

- A copy of an Asset Purchase Agreement ("APA"), documenting that Celadon purchased Continental's trucking business on December 4, 2008.  *See* ECF No. 55-3.

- Attachments to the APA titled "Schedule 5.2" and "Schedule 5.6"

  - Paragraph 5.2 of the APA provides that "Schedule 5.2(a) (the "Driver List") sets forth the name of and employment information for each employee driver, owner-operator driver and lease-purchase driver of Seller . . . on the Closing Date."

  - Paragraph 5.6 of the APA provides: "For a period of Fourteen (14) days immediately following the Closing Date, Seller shall . . . continue to employ the Non-Drivers not offered employment that are listed on

Schedule 5.6 and required for transition activities . . . . "

- The affidavit of Timothy Hodnett, who had served as Continental's vice president of human resources.  Hodnett testified that Schedule 5.6 lists the names of all non-drivers employed at Continental's corporate offices as of December 4, 2008 and that  Schedule 5.2 lists the names of truck drivers that were employed by Continental as of December 4, 2008.  *See* ECF No. 55-5.  According to Hodnett's testimony, not one of the individuals listed on Schedules 5.2 and 5.6 was terminated on or prior to the December 4, 2008 sale date, but some were terminated on or  before December 17, 2008.

- A document provided by Celadon in response to a discovery request, titled "Continental Drivers Hired by Celadon and Current Status," which listed the names of all former Continental drivers hired by Celadon following its purchase of Continental's business.[3]  *See* ECF No. 55-7.

- A document provided by Celadon in response to a discovery request, which listed all former Continental administrative personnel hired by Celadon following its purchase of Continental's business.  *See* ECF No. 55-7.

- The affidavit of Stuart R. Day, who had worked as Continental's vice president of operations.  Day testified that he participated in transition activities that took place after the December 4, 2008 sale and that  "[t]here  were no WARN Act notices sent to [former Continental] employees who continued to work for Celadon following the sale and had their employment subsequently terminated." ECF No. 55-6, ¶ 3.

Local Rule 56.1 provides that a party moving for summary judgment must submit a

statement of the material facts as to which it contends there is no genuine issue to be tried, and

the non-moving party must file a responsive statement of the material facts as to which it

contends a genuine issue exists to be tried.  The Rule provides:  "All material facts set forth in

the statement filed by the moving party . . . shall be *deemed admitted* unless controverted by the

---

[3]Plaintiffs' Interrogatory No. 1 sought the names of "each and every employee who was employed by [Continental] on [December 4, 2008]."  Pls.' November 6, 2013 Hr'g Ex. #1, at 1. In its response, Celadon provided the list titled "Continental Drivers Hired by Celadon and Current Status," and stated that the list contained the names of "all former [Continental] drivers that [Celadon] hired."  *Id*.  Celadon also provided Plaintiffs a "list of former [Continental] administrative personnel that [Celadon] hired."  *Id*. at 1-2.

statement filed by the non-moving party . . . . " Local Rule 56.1(c)(emphasis added).

Paragraph 14 of Plaintiffs' statement of material facts in support of summary judgment stated: "On the date of the sale, there were 658 employees working for Continental." ECF No. 57, ¶ 14.  In its responsive statement, Celadon specifically stated that it "did not dispute the allegations in paragraphs 8-16" set forth in Plaintiffs' statement."  ECF No. 64, ¶ 6.

Plaintiffs cited Schedules 5.2 and 5.6 in support of its assertion that there were 658 employees working for Continental on December 4, 2008, the day that Celadon purchased Continental's business.  Schedule 5.6 listed 113 administrative employees and Schedule 5.2 listed 545 drivers.  Plaintiffs further asserted that pursuant to the WARN Act's sale-of-business provision, 658 former Continental "employees" listed on Schedules 5.2 and 5.6  became Celadon "employees" immediately after Celadon purchased Continental's trucking business on December 4, 2008.  Plaintiffs acknowledged that Celadon's discovery responses showed that Celadon retained 201 of the aforementioned 658 employees.  Plaintiffs also recognized that eight administrative employees listed on Schedule 5.6 did not work from Continental's operation in Little Rock and therefore did not meet the class definition.  Based on the evidence presented, Plaintiffs claimed that the remaining 449 employees listed on Schedules 5.2 and 5.6 suffered an "employment loss" as a result of a "mass layoff" that occurred on or about December 17, 2009.

In its response in opposition to summary judgment, Celadon did not dispute that the 449 class members identified by Plaintiffs had been employed at Continental's Little Rock facility and suffered an "employment loss" as part of a "mass layoff" that occurred on or about December 17, 2008.  Nor did Celadon dispute Day's testimony that Celadon failed to provide WARN Act notice to the 449 class members.  Instead, Celadon argued that it was not responsible

for providing WARN Act notice because it merely purchased Continental's assets, which did not

amount to the sale of all or part of a business as required under the WARN Act's sale-of-

business provision.  The Court found that the undisputed evidence established that Celadon

purchased Continental's business as a going concern on December 4, 2008 and that the class

members became Celadon employees by operation of the WARN Act's sale-of-business

provision.  And, given the uncontroverted evidence that 449 individuals identified as class

members suffered an "employment loss" as part of a "mass layoff," without receiving the notice

required under the WARN Act, the Court granted Plaintiffs' motion for summary judgment as to

liability.

### Summary Judgment Proceedings on Damages

> After the Court's summary judgment ruling, the parties filed a joint motion, stating in

part as follows:

> Counsel for the parties have conferred, and have determined that the most
> economical and efficient method to address the damages portion of the class action
> would be through stipulations after a claims  process.  Consequently, counsel for
> both parties request that the trial be continued at this point in order to allow them to
> attempt to produce a stipulated damages amount to the Court.

ECF No.  76, at 1.

> The parties also requested a telephone conference for the purpose of developing a plan

for resolving the issue of damages.  *See* docket entry #76.   The Court continued the trial date

and scheduled a telephone conference as requested.  *See* docket entry #77.   However, before a

teleconference could take place, Celadon engaged new counsel and sought to appeal the Court's

ruling on liability.  On April 11, 2012, the Eighth Circuit denied Celadon's petition for

interlocutory appeal.

On August 7, 2012, Plaintiffs filed a motion for summary judgment on damages. Plaintiffs submitted spreadsheets containing damage amounts for each class member, along with an affidavit by Timothy A. Hodnett, who had served as Continental's vice president of human resources.  Hodnett testified that the damage spreadsheets were prepared under his direction, that he had reviewed the source documents underlying the spreadsheet data, and that the spreadsheets reflected "an accurate calculation of wages and benefits [the] employees would have earned during the 60-day notice period."  ECF No. 103-8, ¶ 5.

Plaintiffs' counsel, Abraham Bogoslavsky, submitted an affidavit stating that he and Celadon's original counsel of record, Michael S. Moore, had agreed that Plaintiffs would submit a spreadsheet on damages and that Celadon would have an opportunity to review the spreadsheet and assert objections.  Bogoslavsky explained that he and Moore believed they "could agree on almost all damages and streamline the trial, if one was even necessary." ECF No. 103, Ex. G. ¶ 3.  Bogoslavsky further testified that based on his communications with Moore, he believed that Celadon would not dispute any damage calculations that were based on a W-2, a pay stub, tax information, or an affidavit.  *Id*, ¶ 6.

On August 11, 2012, Celadon sought relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure, asserting that it could not adequately respond to Plaintiffs' motion for summary judgment without examining the source documents underlying Plaintiffs' damage spreadsheets and deposing Hodnett and others.   The Court declined to reopen discovery and noted that Celadon had never before requested an extension of the April 19, 2010 discovery deadline.[4]

---

[4]Shortly after Plaintiffs initiated this lawsuit, the parties filed a joint report pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, and they reported that discovery should be completed by January 20, 2010. *The parties did not request bifurcated discovery*.  Consistent

However, the Court extended Celadon's response time and directed Plaintiffs to make all documents supporting Plaintiffs' damage calculations available for Celadon's inspection.

Subsequently, Celadon filed a cross-motion for summary judgment, arguing among other things that Plaintiffs' class roster included "excludable" class members.  Celadon presented evidence that the class roster included (1) 148 individuals who worked for Continental as owner/operators or independent contractors; (2) 182 individuals who were offered positions or hired by Celadon; and (3) 11 individuals who were not employees of Continental's operation in Little Rock.

Although Celadon had the burden to present the aforementioned evidence in opposition to Plaintiffs' motion for summary judgment on liability, the Court exercised its discretion to give

_____

with the Rule 26(f) report, the Court set discovery and motions deadlines for January 20, 2010 and a jury trial for March 8, 2010.

Thereafter, Plaintiffs filed their first motion for class certification, and while that motion was pending, the parties filed a joint motion for a continuance of the trial date and extensions of the discovery and motions deadlines.  The parties stated: "Both parties believe that this case may be resolved on Motions for Summary Judgment upon the final completion of all necessary discovery."  ECF No. 25, ¶ 4.  By order entered January 26, 2010, the Court continued the trial date and extended the discovery deadline to April 19, 2010.  Thereafter, the Court denied without prejudice Plaintiffs' initial motion for class certification.

On April 2, 2010, Plaintiffs filed a second motion for class certification, and on April 14, 2010, both parties requested an extension of the motions deadline, but neither side requested an extension of the discovery deadline.   The Court granted the motion and extended the motions deadline to June 2, 2010.

After Plaintiffs filed a reply in support of the second motion for class certification, but before the Court could decide the motion, the parties filed a second joint motion requesting an extension of the motions deadline, again stating that the "parties believe  that his case may be resolved on Motions for Summary Judgment."  ECF No. 42, ¶ 4.   The discovery deadline had expired, and neither side requested that the Court reopen discovery.  The Court extended the motions deadline as requested by the parties.

Celadon the opportunity to contest the inclusion of the disputed class members.[5]  The Court

denied summary judgment as to damages and notified the parties that it would schedule a

telephone conference for the purpose of developing a plan for identifying class members and

determining damages.

On March 13, 2013, the Court convened a telephone conference.  Counsel reported that

both sides had offered proposals for resolution of this case, but they were unable to agree.

The Court then referred the case to United States Magistrate Judge H. David Young for

necessary proceedings and a recommended disposition as to which individuals seeking damages

in the case are  properly included within the plaintiff class.  *See* ECF No. 132.

### III.  Judge Young's Findings and Recommendation

Judge Young held an evidentiary hearing and received post-hearing filings, including

Plaintiffs' Exhibits A, B, and C, which listed the individuals who Plaintiffs contend are members

of the class.  *See* ECF Nos. 149-1 (Pls.' Ex. A), 149-2 (Pls.' Ex. B), 149-3 (Pls.' Ex. C).   In

formulating his findings and recommendations, Judge Young used Plaintiffs' Exhibits A, B, and

C as a starting point, and he considered whether Plaintiffs had established that each individual

listed on those exhibits qualified as a member of the plaintiff class.

The Court clarifies that it did not intend that Plaintiffs prove, once again, that each

individual listed on the class roster meets the class definition and qualifies as an "aggrieved

employee" under the WARN Act.  In support of their first summary judgment motion, which the

_____

[5]Federal Rule of Civil Procedure 54(b) permits a trial court to reconsider interlocutory
rulings.  It provides that "any order or other decision ... that adjudicates fewer than all the claims
or the rights and liabilities" of the parties that does not end the case "may be revised at any time
before the entry of a judgment adjudicating all the claims and all the parties' rights and
liabilities." Fed. R. Civ. P. 54(b).

Court granted,  Plaintiffs presented evidence identifying 449 former Continental employees, who suffered an "employment loss" as part of a "mass layoff" that occurred after Celadon purchased Continental.  Celadon failed to seasonally dispute Plaintiffs' evidence, and the Court's summary judgment ruling on liability, which remains the law of this case, extends to each of the 449 individuals previously established as members of the class.  In denying Plaintiffs' motion for summary judgment on damages, the Court noted that it has discretion under Rule 54(b) of the Federal Rules of Civil Procedure to reconsider previous rulings.  Such discretion, however, is limited to the law of the case doctrine and  "subject to the caveat that 'where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 167 (2d Cir. 2003)(quoting *Zdanok v. Glidden Co*., 327 F.2d 944, 953 (2d Cir.1964)); *see also Chism v. W.R. Grace & Co.,* 158 F.3d 988, 992 n. 4 (8th Cir.1998)("Motions for reconsideration cannot be used to introduce new evidence that could have been produced while the summary judgment motion was pending.").  At this juncture, Celadon  has the burden to show that specific class members, identified by Celadon, should be excluded from the class.  Celadon is not entitled to retry this case from the beginning merely because it has retained new counsel.

       This Court admittedly should have directed the magistrate judge to find which class members should be *excluded* from the class as opposed to which members should be *included.* This Court's failure to give proper direction in the referral order does not alter the fact that the defendant failed to dispute liability as to the 449 aforementioned persons, and despite the lack of a clear commission, the post-referral proceedings and Judge Young's findings have assisted the

Court's decision.

### A.     Administrative/Non-drivers

Plaintiffs' Exhibit A, titled "administrative/non-drivers," lists seventy-five class members who, with one exception,[6] are listed on Schedule 5.6 and do not appear on the list of administrative employees hired by Celadon.  Plaintiffs previously established that the individuals listed on Exhibit A became Celadon employees pursuant to WARN Act's sale-of-business provision and that they suffered an employment loss as part of a mass layoff, without receiving WARN Act notice.

Judge Young found that each individual appearing on Exhibit A is properly included in the class, with the exception of Angela Berry[7] and James Dunbar.  Plaintiffs state no objection to the exclusion of Angela Berry, but they do present arguments that impact the inclusion of James Dunbar.  For reasons stated in Section B of this order, the Court finds that James Dunbar is properly included as a member of the plaintiff class.[8]

Celadon objects that six of the administrative/non-drivers listed Plaintiffs' Exhibit A worked outside of Little Rock and should therefore be excluded from the class, which is limited to "persons who were employees of the former Continental operation in Little Rock."  However,

---

[6]James Dunbar is the only class member listed on Plaintiff's Exhibit A whose name does not also appear on Schedule 5.6.  Instead, Dunbar is listed on Schedule 5.2, the list of former Continental drivers.  Judge Young found that Dunbar is not a member of the class because a copy of Schedule 5.2 presented at the evidentiary hearing indicated that he met Celadon's hiring requirements.  However, for reasons stated in Section B of this order, the Court finds that Celadon has failed to show that it hired or offered employment to Dunbar.

[7]Judge Young reports that Plaintiffs previously acknowledged that Angela Berry was not a member of the class.  *See* ECF 157, at 7.

[8]*Supra* note 6.

the Court finds that Judge Young properly credited the testimony of Timothy Hodnett, who testified that the individuals in question were supervised from Continental's Little Rock office. The Court further finds that individuals who were supervised from Continental's Little Rock office qualify as "persons who were employees of the former Continental operation in Little Rock" and that all class members listed on Plaintiffs' Exhibit A (ECF No. 149-1), with the exception of Angela Berry, are included in the class.

### B. Drivers

Celadon contends that a portion of the driver plaintiffs listed on the class roster do not meet the class definition because (1) they were hired or offered employment by Celadon; (2) they worked from non-Little Rock terminals; (3) they worked as independent-contractor drivers, or (4) they were employed by Northstar Transportation Solutions, LLC ("Northstar") or Arkansas Trucking Services, Inc. ("ATS").

*Hired or Offered Employment*

In the proceedings before Judge Young, the parties stipulated to the admission of an unedited copy of Schedule 5.2, received as Plaintiffs' Exhibit #3. Celadon presented the testimony of James Steele, who served as Celadon's recruiting agent when Celadon purchased Continental. Steele testified that before the sale, he served on an acquisition team that carried out a due diligence investigation at Continental's Little Rock facility. Hr'g Tr. at 78-79. Steele recalled that he reviewed Continental's personnel records for the purpose of identifying drivers that met Celadon's hiring criteria and that he had access to "driver qualifications files, accident history, the whole gambit of driver information." Hr'g Tr. at 79. Steele explained that the acquisition team worked from a list provided by Continental, which listed drivers' names and

13

addresses.  He further testified that Celadon's acquisition team modified the list by adding a

column titled "Hire."  Steele identified the unedited copy of Schedule 5.2, introduced as

Plaintiffs' Exhibit #3, as the modified list, and he testified that a "yes" entry under the "Hire"

column indicated that the driver met Celadon's hiring requirements and was offered a job with

Celadon.  Judge Young credited Steele's testimony and found that drivers listed on Schedule 5.2

with a "yes" entry were offered employment or hired by Celadon and thus did not qualify as

members of the class.

Plaintiffs object and point out that on cross examination, Steele acknowledged that a

"yes" entry on Schedule 5.2 only meant that the driver in question appeared to meet Celadon's

minimum job requirements and that he or she received a conditional job offer, subject to

additional pre-employment screening.  Steele admitted that a "yes" entry did not guarantee that

Celadon actually hired the driver because after further investigation, he and other Celadon

recruiters determined that some drivers with a "yes" designation did not meet Celadon's hiring

requirements.[9]  Steele also acknowledged Celadon withdrew some of the conditional offers of

employment it had extended to drivers who initially received a "yes" designation on Schedule

5.2, but he could not identify those drivers.  *See* Hr'g Tr. At 104-105.  Additionally, when asked

whether Celadon offered a job to every driver who qualified for employment, Steele responded:

---

[9]  The following exchange occurred during Plaintiffs' cross examination of James Steele:

> Q:     So there's some yeses that may end up being no when you do further
>        investigation; there's some noes that may be yeses?
>
> A:     That is correct.

Hr'g Tr. at 108.

"Yes, they were either offered a job or we made every attempt to try to get a hold of them."  *See*

Hr'g Tr. at 84.   Considering Steele's full testimony, the Court finds that Celadon failed to show

that drivers listed on Schedule 5.2 with a "yes" entry should be excluded from the class.[10]

Steele further testified that Celadon hired a portion of drivers with a "no" entry on

Schedule 5.2, after additional investigation revealed that they met Celadon's hiring requirements.

Two drivers with a "no" on Schedule 5.2, Duarl Richardson and Randy Anthony, appear on the

document  "Continental Drivers Hired by Celadon and Current Status," which listed the names

of all former Continental drivers hired by Celadon.  Judge Young finds that Richardson and

Anthony were hired by Celadon and do not qualify as members of the class, and the Court adopts

that finding.

*Independent-Contractor Drivers*

Celadon claims that some members of the class should be excluded because they served

Continental as independent-contractor drivers and thus do not qualify as "employees of the

former Continental operation in Little Rock."   Celadon correctly notes that Schedule 5.2 was

prepared in accordance with ¶ 5.2 of the APA, which provides: "Schedule  5.2(a) (the "Driver

List") sets forth the name of and other employment information for each employee driver, owner-

operator driver and lease-purchase driver of Seller on the Closing Date."  ECF 55-3, at 7 (APA ¶

5.2(a)).  Steele testified that "employee drivers" drove trucks owned by Continental, but "owner-

_____

[10]Judge Young noted "conflicting evidence" as to whether drivers with a "yes" entry were actually hired by Celadon, but he found that Plaintiffs offered no evidence to the contrary. However, Plaintiffs previously established that the individuals listed on Schedule 5.2, with the exception of drivers listed on a document produced by Celadon, titled "Continental Drivers Hired by Celadon and Current Status," qualify as members of the class.

operators" drove trucks that they owned, and "lease-purchase drivers" drove trucks that they leased from Continental.  *See* Hr'g Tr. at 76-77.    Additionally, Steele offered his opinion that former Continental owner-operators and lease-purchase drivers worked as independent contractors, not employees.

Steele testified that as part of his due-diligence activities, he identified Continental drivers who worked as independent contractors.  *See* Hr'g Tr. at 88.   Celadon proffered Defendant's Exhibit #4, a heavily edited version of Schedule 5.2 that includes the handwritten notation "CEI-IC" beside the names of twenty-five drivers.  Steele testified that  "one of two gentlemen" who assisted him in the due-diligence process made the "CEI-IC" notations at his direction, indicating that the driver in question worked for Continental as an independent contractor.  *See* Hr'g Tr. 94.  Steele provided no specific testimony as to how he determined whether a Continental driver worked as an independent contractor, but it appears that if a driver entered a lease-purchase agreement, Steele assumed that he or she worked as an independent contractor.  *See* Hr'g Tr. at 92-95.

Plaintiffs presented the testimony of Timothy Hodnett, who testified that none of Continental's drivers owned his or her own truck.  *See* Hr'g Tr. at 71.  Hodnett acknowledged that a portion of Continental's drivers entered lease-purchase agreements, which provided that Continental retained exclusive possession and control of the leased equipment during the lease period.  Hr'g Tr. At 66, *see also* Def's Hr'g Exs. #1, #2 (Contractor Operating Agreements).  However, Hodnett stated that "the lease operator was basically a glorified driver, [who] received a higher rate of mileage pay to cover some additional expenses that they had."  Hr'g Tr. At 37.  According to Hodnett, Continental dispatched the leased trucks and controlled how they were

utilized.  *Id*.  He also stated that Continental's lease-purchase drivers performed trucking services "just like company drivers."  *Id*.

Plaintiffs also presented a benefits schedule showing that Continental provided insurance benefits to a portion of the class members,[11] and Hodnett testified that Continental granted such benefits to employees, not independent contractors.  *See* Hr'g Tr. at 26.   Hodnett explained that not every Continental employee participated the company's benefits program but that participating drivers were employees, not independent contractors.

Judge Young found that if a class member's name appeared on Continental's benefits schedule, he or she qualified as an employee driver.   But absent such evidence, Judge Young found that Plaintiffs failed to demonstrate that drivers included in the class served Continental as employee drivers, not independent contractors.   The Court declines to adopt this finding.   For reasons previously stated, the Court finds that Celadon shoulders the burden to prove that specific class members worked for Continental as independent contractors and thus do not qualify for inclusion in the class.   The Court further finds that Celadon has failed to carry this burden.

*Northstar Transportation Solutions - Northstar*

The APA at issue in this case was entered by and among Celadon, as purchaser, and three

---

[11]Hodnett testified that he prepared an insurance schedule in November 2008 that recorded the names of Continental employees who received health insurance benefits.  Plaintiffs introduced the insurance schedule at the hearing as Plaintiffs' Exhibit #9.  *See* Hr'g Tr. at 27. Hodnett explained that he prepared the insurance schedule in advance of Continental's insurance renewal.  According to Hodnett, the insurance schedule does not include every former Continental employee as of November 2009, but every person listed was a Continental employee, not an independent contractor.

sellers:  Continental, Northstar, and Great Western LLC.  The introductory paragraph of the APA provides that Continental, Great Western, and Northstar "are referred to herein collectively as 'Sellers,' and when the context so requires, individually as 'Seller'" . . . .  ECF No. 55-3, at 1. Celadon argues that it is possible that the drivers listed on  Schedule 5.2, and by extension individuals listed on the class roster, may have been employed by Northstar, not Continental. However, paragraph 5.2 of the APA states that "Schedule 5.2(a) (the 'Driver List') sets forth the name . . . for each employee driver, owner-operator and lease-purchase driver of the *Seller* . . . on the Closing Date." ECF No. 55, ¶ -3, at 7(emphasis added).  Furthermore, in response to Plaintiffs' motion for summary judgment on liability, Celadon specifically stated that it did not dispute that on December 4, 2008, Continental employed 658 individuals, including the drivers listed on Schedule 5.2.[12]  *Compare* ECF No. 57, ¶ 14 *with* ECF No. 64, ¶ 6.

Steele testified that in the course of performing his due diligence investigation, he noted that some drivers listed on Schedule 5.2 worked for Northstar.  *See* Hr'g Tr. at 92.  However, Steele provided no details as to how he determined that a driver worked for Northstar, and the Court finds that Celadon has failed to show that specific class members worked for Northstar, not Continental.

*Arkansas Trucking Services - ATS*

After Plaintiffs moved for summary judgment on damages, the Court directed Plaintiffs to make all documents supporting Plaintiffs' damage calculations available for Celadon's

---

[12]Additionally, in response to Plaintiffs' discovery request seeking the names of "each . . . employee who was employed by Continental . . . on the date that the sale . . . was finalized[,]" Celadon referred to "the schedules attached to the [APA] regarding [Continental] employees." Pls.' Hr'g Ex. #1, at 1-2.

inspection.  Celadon reports that the documents it reviewed included wage and tax statements issued by ATS, and it contends that thirty-six class members were likely employed by ATS, not Continental.  Celadon further states that it believes that Plaintiffs' payroll and tax records show that ten additional class members were not employed by Continental on December 4, 2008.

In his testimony before Judge Young, Hodnett characterized ATS as a "shell company," with no employees.  Hodnett testified that Continental employed and paid individuals that were merely labeled ATS employees and that Continental prepared the payroll and funded a "zero balance" account for ATS.  *See* Hr'g Tr. At 36-37.  In light of Hodnett's testimony, the Court finds that Celadon has failed to show that a portion of class members were ATS employees.  The Court also finds that Celadon has failed to show that ten class members were not employed by Continental on December 4, 2009.  Celadon urges the Court to reopen discovery on these issues, but for reasons that follow, that request is denied.

In sum, the Court adopts Judge Young's recommendation that the following individuals be excluded from the plaintiff class: Angela Berry, Duarl Richardson, and Randy Anthony.

## IV.  Celadon's Motion for Discovery

Celadon requests that the Court reopen discovery and order Plaintiffs to all produce payroll and tax records in their possession.  Celadon reports that such records, which defense counsel has examined but does not possess, show that at least thirty-six class members were employed by ATS, not Continental.  Celadon also claims that the records "call into question whether at least ten other individuals . . . were in fact employed by Continental at the time of the sale in December 2008."  ECF No. 161, ¶ 8.

Rule 16 of the Federal Rules of Civil Procedure requires a district judge to issue a scheduling order that limits the time to join parties, amend pleadings, complete discovery, and

file motions, *see* Fed. R. Civ. P. 16(b)(1), and the Court's discovery deadline in this case expired on April 19, 2010.[13]  A modification of the Court's scheduling order is proper only when the movant has demonstrated good cause, *see* Fed. R. Civ. P. 16(b), and the primary measure of good cause is the movant's diligence in attempting to meet court-ordered deadlines.  *See Bradford v. DANA Corp.*  249 F.3d 807, 809 (8th Cir. 2001).   In support of its motion for discovery, Celadon states that the documents it seeks are necessary "so that the Court may have a complete record to consider in determining class membership."  *Id.*, ¶ 10.  However, the Court has decided the issue of class membership, and Celadon has failed to persuade the Court that good cause exists for reopening discovery.

### V.  Celadon's Renewed Motion for Decertification

In certifying the class, the Court determined that Plaintiffs met the numerosity, commonality, typicality, and adequacy of representation requirements under Rule 23(a).  The Court further determined that certification was proper under Rule 23(b)(3) because common issues regarding Celadon's liability for WARN Act violations outweighed any potential, individual damages issues.  Celadon now contends that the class must be decertified because the resolution of Plaintiffs' claims will require individual inquiries regarding the make-up of the class.  However, as previously explained, issues regarding class membership and liability have been decided.

Celadon also contends that the Supreme Court's decision in  *Comcast v. Behrend*, ⸺ U.S. ⸺, 133 S.Ct. 1426, 185 L. Ed.2d 515 (2013), precludes the maintenance of a class in this case because damage determinations will require a careful analysis of individual circumstances.

---

[13]*See supra* footnote 4 discussing the Court's discovery deadline and related background.

The Court disagrees.  In *Comcast*, an antitrust action, the Supreme Court concluded that the district court erred in certifying a class because the plaintiffs' damages model was incongruent with the theory of liability.[14]  Unlike *Comcast*, this is not a case in which the plaintiffs must demonstrate the existence of a uniform damage methodology directly related to the asserted theory of liability.  The class members have suffered the same injury, and a straight-forward remedy is provided by statute.   An employer found to have violated the WARN Act is liable for back pay and benefits for each day of the violation.  *See* 29 U.S.C. § 2104(a)(1).  Given differences in pay and benefits, damages will not be identical for each class member, but individualized damage questions do not warrant decertification.

## VI.  Plaintiffs' Motion for Sanctions

In support of their motion for sanctions, Plaintiffs charge that Celadon withheld information that Plaintiffs sought during discovery but produced such information in a last-minute attempt to avoid the Court's ruling on liability and drastically reduce the size of the plaintiff class.  Plaintiffs note that early in this case, they sought and obtained an order compelling Celadon to provide initial disclosures and responses to Plaintiffs' interrogatories and requests for production.  Plaintiffs' Interrogatory No. 1 sought the name of "each and every

---

[14]The class in *Comcast v. Behrend*, ⸺ U.S. ⸺, 133 S.Ct. 1426, 185 L. Ed.2d 515 (2013), included more than 2 million current and former Comcast subscribers, who charged that the company engaged in practices that eliminated competition and held prices for cable services above competitive levels.  The plaintiffs pursued four separate theories of antitrust impact, but the district court accepted only one of those theories as capable of class-wide proof.   In moving for class certification, the plaintiffs submitted a damages model that calculated overall damages based on combination of all four theories of antitrust impact, not the specific theory that the district court deemed suitable for certification.  Nonetheless, the district court refused to entertain arguments bearing on the propriety of class certification and the impact of the plaintiffs' broad damages model, and it granted class certification under Rule 23(b)(3).

employee" who was employed by Continental on the date that Continental's sale to Celadon was finalized. *See* Pls.' Hr'g Ex. #1, at 1. For each employee listed, Plaintiffs sought a corresponding job title, work address, home address, date of termination, and rate of pay. Plaintiffs also sought the current position of former Continental employees who were hired by Celadon.

In response to Plaintiffs' discovery request, Celadon produced two lists, which it described as "a list of all former [Continental] drivers [Celadon] hired as well as a list of former [Continental] administrative personnel [Celadon] hired." *Id.* Celadon also referred Plaintiffs to Schedules 5.2 and 5.6, which they described as the "schedules attached to the Asset Purchase Agreement regarding [Continental] employees." *Id.* at 2. And in response to Plaintiffs' Request for Production No. 1, requesting "a copy of any and all lists" of persons employed by Continental at the time of the sale at the time, Celadon stated that it had no such lists, but it stated: "See Response to Interrogatory No. 1." *Id.* at 4.

In support of their motion for summary judgment on liability, Plaintiffs presented Schedules 5.2 and 5.6 and aforementioned "hire lists" that Celadon produced in discovery. Plaintiffs asserted that, with a few exceptions noted by Plaintiffs, the individuals listed on Schedules 5.2 and 5.6, which were not included on Celadon's hire lists, were members of the plaintiff class, who suffered an "employment loss" as a result of a "mass layoff" that occurred after Celadon purchased Continental. Celadon did not dispute those assertions, and the Court granted summary judgment in Plaintiffs' favor.

Plaintiffs assert that either the facts that went unchallenged at the liability stage should be deemed established or the Court should order Celadon to pay all costs and fees that Plaintiffs

incurred following the Court's summary judgment ruling on liability.   The Court finds that its rulings regarding excludable class members adequately address the issues raised by Plaintiffs and that the motion for sanctions should be denied.

## VII.  Damages Phase

With the issues of class membership and Celadon's liability finally decided, the case will now proceed, without delay, on the issue of damages.   When Plaintiffs commenced this case, they demanded a trial by jury, and by letter to the Court dated April 21, 2014, Plaintiffs' counsel requested that the Court schedule a jury trial "at the earliest possible setting."   The WARN Act does not specifically address the right to a jury, leaving it to the courts to decide whether a jury trial is constitutionally required.  The Eighth Circuit has not addressed this question, but after careful consideration, the Court finds that a jury trial is not required.

The Seventh Amendment preserves the right to a jury trial in "suits at common law" filed in federal court, and the Supreme Court has established a two-prong test for determining whether a party enforcing a statutory right is entitled to a jury trial under the Seventh Amendment. *See Tull v. United States*, 481 U.S. 412, 417–18, 107 S.Ct. 1831 (1987).   First, a court must compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. *Id.*  Second, a court must examine the remedy sought and determine whether it is legal or equitable in nature, and this inquiry is more important that the first.  *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565, 110 S.Ct. 1339 (1990).

In *Bledsoe v. Emery Worldwide Airlines, Inc.*, 635 F.3d 836 (6th Cir. 2011), the Sixth Circuit found that the back pay remedy available under the WARN Act provides equitable

restitutionary relief for which there is no constitutional right to a jury trial.  The Sixth Circuit reasoned that the exclusive WARN Act remedy is restitutionary and equitable in nature because it seeks to restore the pay and benefits the employer should have provided aggrieved employees during or in lieu of a sixty-day notice period.  *See Bledsoe*, 635 F.3d at 843.   The Court of Appeals also noted that the WARN Act grants a district court discretion to reduce the amount of the liability or penalty, which reinforces the view that WARN Act remedies are equitable in nature.  *See Bledsoe*, 635 F.3d at 844(citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 443, 95 S.Ct. 2362 (1975) (Rehnquist, J., concurring)("To the extent, then, that the District Court retains substantial discretion as to whether or not to award backpay notwithstanding a finding of unlawful discrimination, the nature of the jurisdiction which the court exercises is equitable . . . . ").   This Court agrees with the Sixth Circuit's reasoning and finds that WARN Act damages are restitutionary in nature and analogous to reimbursement of wrongfully withheld funds, as opposed to compensation for damages flowing from wrongful termination.  Accordingly, the Court finds that Plaintiffs are not entitled to a jury trial.  The Court will direct the parties to file proposed findings of fact and conclusions of law, which will enable the Court to identify disputed issues and determine the most efficient way to proceed.

IT IS THEREFORE ORDERED that the findings and recommendations (ECF No. 157) issued by United States Magistrate H. David Young are adopted as this Court's findings to the extent that Angela Berry, Duarl Richardson, and Randy Anthony are excluded from the plaintiff class.

IT IS FURTHER ORDERED that Defendant's motion for discovery (ECF No. 161), Defendant's renewed motion for decertification (ECF No. 163), and Plaintiffs' motion for

sanctions (ECF No. 165) are DENIED.

IT IS FURTHER ORDERED that Defendant's motion *in limine* and for judicial notice (ECF No. 153)[15] and Plaintiffs' motion to dismiss Defendant's renewed motion for decertification (ECF No. 167) are DENIED AS MOOT.

IT IS FURTHER ORDERED that the parties must file, on or before July 31, 2014 proposed findings of fact and conclusions of law concerning damages for the claims on which liability has been established.  The submissions should include any affidavits and documentary evidence that support the proposed findings.  Counsel should draft findings in neutral language, avoiding argument, and identify specific evidence expected to establish each proposed finding. The parties will have up to and including August 14, 2014 in which to file a response to the opposing party's proposed findings of fact and conclusions of law.

IT IS SO ORDERED THIS 16th DAY OF JUNE, 2014.


/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE

---

[15]Before Judge Young issued his findings and recommendations, Celadon filed a motion asking the Court to take judicial notice of a "company snapshot" for Northstar Transportation Solutions, LLC ("Northstar"), issued by the United States Department of Transportation. Celadon asserts that the snapshot shows that Northstar was granted carrier operating authority, which it claims contradicts Plaintiffs' evidence.  For reasons explained in this order, the Court finds that Celadon has failed to show that specific class members should be excluded from the class on the ground that they worked as Northstar employees.